**MICRO–MAGNETIC INDUSTRIES, INC., a corporation, Plaintiff,**

v.

**ADVANCE AUTOMATIC SALES CO., INC., a corporation, et al., Defendants.**

**No. C–48708.**

United States District Court, N. D. California, July 17, 1972.

See also, 9 Cir., 488 F.2d 771.

———◆———

Karl A. Limbach, Limbach, Limbach & Sutton, San Francisco, Cal., for plaintiff.

Carl Hoppe, Eckhoff, Hoppe, Slick, Mitchell & Anderson, San Franciso, Cal., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW; JUDGMENT

WEIGEL, District Judge.

*Findings of Fact*

I. GENERAL INFORMATION

1. Plaintiff, Micro-Magnetic Industries, Inc., is a California corporation with its principal place of business in Palo Alto, California.

2. Plaintiff is the assignee of United States Patent No. 2,964,641, referred to hereafter as Selgin II to distinguish it from an earlier United States Patent, No. 2,646,717, referred to hereafter as Selgin I.

3. Plaintiff's machines are properly marked with the number of Selgin II.

4. Defendant ARDAC, sometimes referred to hereafter as defendant, is an Ohio corporation having its principal place of business in Chesterland, Ohio.

5. Defendant Advance Automatic Sales Co., Inc., is a California corpora-

tion having its principal place of business at San Francisco, California.

6. Defendant Pacific Nik-O-Lok Co., Inc., is a California corporation having a regular place of business in San Francisco, California.

7. Defendant Standard Change Makers, Inc., is an Indiana corporation having a regular place of business in San Francisco, California.

8. Defendant ARDAC has made and sold dollar bill validators known as Mark 2, Mark 4, Mark 5, and Mark 7 machines. All of these machines are equivalent to each other for the purposes of this case. A typical machine of the type manufactured by ARDAC will be referred to hereafter as defendant's machine.

9. Defendant Pacific Nik-O-Lok, Inc., has sold at least one of defendant's machines in this district.

10. Defendant Advance Automatic Sales Co., Inc., has sold at least one of defendant's machines in this district.

11. Defendant Standard Change Makers, Inc., has sold 6,631 of defendant's machines for a total selling price of $2,107,782. At least one of such machines was sold by Standard Change Makers, Inc., within this district.

12. Defendant ARDAC intervened in this action as a party defendant and waived any defense based on venue.

13. Defendant ARDAC has sold 26,297 of defendant's machines for a total selling price of $3,756,361. The above figure includes the sale of 6,631 of defendant's machines to Standard Change Makers, Inc. Based on the average selling price of $142.83, ARDAC received $2,808,895 for the 19,666 machines which it sold to persons other than Standard Change Makers, Inc.

## II. BACKGROUND INFORMATION

14. On December 13, 1960, United States Patent No. 2,964,641, referred to hereafter as Selgin II, was issued to Mr. Paul Selgin. The patent was for a device which could determine the authenticity of certain documents, including dollar bills.

15. At the time when the application which matured into Selgin II was filed, the prior art contained, among others, the following United States Patents: (a) No. 2,646,717, issued on July 28, 1953, to Mr. Paul Selgin and referred to hereafter as Selgin I; (b) No. 2,731,621, issued on January 17, 1956, to Mr. C. G. Sontheimer and referred to hereafter as Sontheimer; (c) No. 2,827,822, issued on March 25, 1958, to Mr. R. L. Timms, and referred to hereafter as Timms.

16. In the fall of 1962, Mr. Riddle, president of plaintiff and Mr. McLaughlin, one of plaintiff's engineers, conceived of the invention, previously patented as Selgin II. At that time, they were unaware of Selgin II and considered their invention to be a major breakthrough in the art.

17. Mr. Riddle consulted patent counsel for the purpose of obtaining a patent on the invention. Patent counsel called Selgin II to Mr. Riddle's attention and advised him to attempt to acquire rights under the patent.

18. Subsequently, Messrs. Riddle and McLaughlin filed a patent application relating to improvements which they had made on Selgin II. This patent application matured into United States Patent No. 3,256,968. This Court has previously ruled on motion for summary judgment that all of the claims of that patent which plaintiff asserts against defendant are invalid.

19. Pursuant to attorney's advice, Mr. Riddle acquired all rights under Selgin II.

20. Starting in 1962, plaintiff made and marketed dollar bill validators which incorporated the Selgin II invention. Plaintiff's sales rose from 15 machines in 1962 to 4500 machines in 1968.

21. Prior to 1967, defendant was a competitor of the plaintiff and produced a dollar bill validator which did not incorporate the Selgin II invention.

22. In the summer of 1967, the President of defendant attended a meeting in California concerning the fare collection equipment which would be used on the Bay Area Rapid Transit System. Upon returning to his company, defendant's president informed defendant's chief engineer, Jack Bayah, that a new design for defendant's machine was needed. The new design had to be capable of rejecting Xerox or photostatic copies of dollar bills, some of which would not be rejected by the machines which defendant had previously produced.

23. About two months prior to the meeting described above, Jack Bayah had analyzed plaintiff's machine, incorporating the Selgin II invention. Within two months after the meeting, Mr. Bayah designed a new bill validator for defendant which, plaintiff claims, incorporates Selgin II.

24. Defendant's machine is substantially cheaper than the plaintiff's. Shortly after defendant's machine was introduced, the rate of increase of plaintiff's sales began to decline. Thereafter, plaintiff's sales began to decline.

## III. DESCRIPTION OF THE INVENTION

25. The Selgin II invention combines seven elements, which interact together to produce the results claimed in the patent.

26. The seven elements are: (1) the bill or document; (2) a light; (3) a mask or reticle; (4) an optical system for superimposing the image of the bill on the mask; (5) a shifter which moves the image of the bill relative to the mask; (6) an electric eye which converts light into electronic impulses; (7) a circuit means, responsive to certain predetermined electronic signals.

27. The bill to be examined must have on it a series of parallel or approximately parallel lines which are of different reflectance from the background on which they are printed. The parallel lines may be crossed by other lines so as to produce cross-hatching (see area to the right of George Washington's head on a $1 bill). Such cross-hatching will not interfere with the operation of the machine.

28. The light illuminates the portion of the bill to be examined.

29. The mask or reticle must contain a series of parallel lines which correspond to the spaces between the parallel lines on the bill. The lines on the mask may be, but do not have to be, wider than the spaces between the lines on the bill. The pattern on the mask is not affected by cross-hatching, and need not be a photo-negative of the area of the bill to be examined. The mask may be produced by many means of which photography and engraving are two.

30. The shifter moves the image of the bill in two directions, one parallel to the lines on the mask, (e. g., right-left) and one perpendicular to the lines on the mask (e. g., up-down).

31. The circuit means consists of an electronic brain which is tuned to respond to the frequency of the impulses generated by a genuine bill. When the proper signal is received, the circuit means signals peripheral equipment that a genuine bill has been accepted.

32. The invention, as shown in the preferred embodiment, works in the following manner:

a. When a bill is placed in the machine, the light (Fig. 1) shines on the bill.

b. The image of a small portion of the bill, containing the parallel lines, progresses through a series of lenses (Fig. 11) onto a mirror (Fig. 5).

c. The shifter, consisting of a motor and series of cams (Fig. 5a, 5b) causes the mirror to tilt cyclically on two axes, thus causing the image of the bill which is reflected off the mirror to move. The purpose of the shifter in making the image of the bill move is two-fold. First, it compensates for irregularities in the shape or positioning of the bill in the machine, thus insuring that the lines on the bill are aligned parallel to the lines on the mask. Second, it causes the im-

age of the lines on the bill to move across the lines on the mask in a direction which is perpendicular to the direction of the lines.

d. As the shifter moves the image of the lines on the bill across the lines on the reticle or mask, the lines on the bill and the lines on the mask will at some times align so that the dark areas on the bill are superimposed over the transparent portions of the mask and so that the light areas on the bill are superimposed over the dark lines on the mask. At such a point, hereafter referred to as "superposition", no light will pass through the mask to the electric eye. At other points, as the shifter moves the image of the bill, the lines on the bill and the lines on the mask will align so that the light areas between the lines on the bill will be superimposed on the transparent areas between the lines on the mask and so that the dark lines on the bill will be superimposed on the dark lines on the mask. At such a point, light from the bill will pass through the mask to the electric eye.

e. During *each* motion of the shifter, the image of the lines on the bill and the lines on the mask will go into and out of superposition many times, so that a series of pulses of light will pass to the electric eye. This series of pulses, produced by the interference of two sets of periodic functions, e. g., parallel lines, may be called a "Moiré effect".

f. The pulses of light falling on the electric eye are converted by the electric eye into a series of electric pulses.

g. The pulses of current are transmitted to the circuit component. If the proper frequency pulse is received, the circuit means transmits a signal to peripheral equipment that the bill is valid.

33. The frequency of the signal which is produced by the Moiré interference of the lines on the bill and the lines on the mask is dependent on the speed of the shifter and the width and spacing of the lines on the bill being tested.

34. The word "particular" in column 4, line 70 of the Selgin II patent refers, not to one frequency, but to a known or predictable frequency, dependent at any point in time on the particular speed of the shifter and the particular width and spacing of the lines on the bill being examined.

35. Because the frequency produced by the Moiré effect is very sensitive to the width and spacing of the lines, the frequency is very sensitive to the sharpness with which the lines are printed. The signal produced is likewise very sensitive to the direction of the lines.

36. The lines on United States currency are one of the most difficult areas to duplicate because of the use of Intaglio Printing by the Bureau of Printing and Engraving. Photostatic copying machines cannot duplicate the fine lines which are printed thereby, nor can normal methods of printing.

37. The Selgin II invention, utilizing Moiré interference, has consequently produced a degree of precision in currency recognition not previously attained. The Selgin II invention has proved capable of detecting Xerox and photostatic copies.

IV. DIFFERENCES FROM THE PRIOR ART

38. Selgin I discloses an apparatus for identifying documents such as dollar bills by the comparison of such document with an exact photonegative of the document.

39. In Selgin I, the document is optically superimposed on the negative. The image of the document is moved so that at some point the dark areas of the negative are perfectly superimposed over the light areas of the bill. At such a point, no light will pass through the negative to the device which senses light.

40. The Selgin I device determines the authenticity of the document by testing for the perfect superpositioning of the negative and the bill.

41. The frequency with which the bill and the negative are perfectly superpositioned in Selgin I is determined solely by the speed with which the shifter moves. Total darkness can occur only once for each motion of the shifter.

42. Selgin II differs from Selgin I in that Selgin I inspects the entire document while Selgin II examines only a portion of the document.

43. Selgin II differs from Selgin I in that Selgin I uses a mask which is an exact photonegative of the bill examined while Selgin II uses a mask containing only parallel lines, which may be produced by means other than photography.

44. Selgin II differs from Selgin I in that in Selgin I, superposition of bill and negative occurs only once during each movement of the shifter, whereas in Selgin II, there are many such positions.

45. Selgin II differs from Selgin I in that in Selgin I, the frequency of perfect superposition is dependent solely on the speed of the shifter, whereas in Selgin II, the frequency is dependent on the speed of the shifter and the width and spacing of the lines. Because the frequency is dependent on the width and spacing of the lines, the Selgin II machine is capable of detecting forged and Xerox copies of dollar bills which the Selgin I machine would not detect.

46. The Selgin I patent was considered by the patent examiner before Selgin II was issued.

47. Timms, as Selgin II, examines only a small portion of the bill.

48. The area of the bill which Timms prefers to examine contains some lines such as those which may be examined by Selgin II.

49. Timms differs from Selgin II in that Timms applies to the small area of the bill the same process as was applied in Selgin I to the entire bill. Timms uses as a mask, an exact photonegative of the portion of the bill which is to be examined. Timms does not employ Moiré interference to determine the validity of the document examined.

50. The word "spurious" in Column 3, line 65, of the Timms patent refers to nearly perfect superpositioning of the bill and the negative (see Column 8, line 18) and not to the high frequency signal produced by Moiré interference.

51. Timms differs from Selgin II in that in Timms, total superpositioning of the bill and negative can occur only once during each passage of the image of the bill over the photonegative while in Selgin II, multiple instances of complete darkness are produced for each movement of the shifter.

52. Timms differs from Selgin II in that in Timms, the frequency with which perfect superpositioning of the negative and the bill occurs is dependent solely on the speed with which the shifter moves. In Selgin II, the frequency of perfect superpositioning is dependent on the speed of the shifter and the width and spacing of the lines on the bill.

53. Timms was considered by the patent examiner before Selgin II was issued.

54. The meaning of the word "spurious" and its relation to Selgin II was considered by the patent examiner before Selgin II was issued.

55. In Sontheimer, an electric eye detects light coming directly from a dollar bill through a small aperture, as the aperture moves across the face of the bill.

56. Sontheimer does not use a mask or reticle of any kind.

57. The electric eye in Sontheimer will produce a high frequency signal whenever the aperture scans across a series of parallel lines.

58. Because Sontheimer does not use a mask, precision analysis can be obtained only by controlling very precisely the speed with which the bill is scanned.

59. Selgin II differs from Sontheimer in that in Sontheimer, no mask or reticle is used.

60. Selgin II differs from Sontheimer in that in Sontheimer, Moiré inter-

ference generated by the interaction of two sets of parallel lines is not used.

61. Sontheimer was considered by the patent examiner before Selgin II was issued.

## V. OBVIOUSNESS

62. All of the prior art cited by defendants was considered by the patent examiner before Selgin II was issued.

63. Mr. Riddle is a man skilled in the currency recognition art.

64. In 1961, Mr. Riddle, without any knowledge of Selgin II, conceived of the use of Moiré interference in currency recognition. At that time, he considered the invention unobvious and a breakthrough in the art.

65. Before this controversy began, Mr. Riddle believed that the validity of the Selgin II patent was conclusive.

66. In the opinion of Mr. Riddle, a man skilled in the currency recognition art and a man familiar with Timms, Selgin I, and Sontheimer, Selgin II would not have been obvious to one skilled in the art at the time the patent application was filed.

67. While Sontheimer, Timms, and Selgin I do disclose some elements of Selgin II, they do not teach the use of Moiré interference patterns as a means of identifying valid currency and it would not be obvious from such patents that such a means of currency recognition could be employed.

68. A third party, American Totalizator Company, saw sufficient merit in Selgin's work to take a license under his patents.

69. Defendant's chief engineer was unsuccessful in his attempts to design a machine of the quality of defendant's Mark 2-Mark 7 machines, despite his knowledge of the art, until he analyzed plaintiff's machine which employed Moiré analysis.

70. The invention of Selgin II was not obvious to one skilled in the art at the time the Selgin II application was filed, and added a novel means to the methods then available or obvious from the prior art by which currency recognition could be achieved.

## VI. INFRINGEMENT

71. In Selgin II, a portion of the bill is examined having parallel lines on it. In defendant's machine, a portion of the bill is examined having parallel lines on it.

72. In Selgin II, a light is used to illuminate the bill. In defendant's machine, a light is used to illuminate the bill.

73. In Selgin II, a mask or reticle is used which need not be photonegative of the portion of the bill examined. Rather, the mask or reticle consists solely of a series of parallel lines which correspond in width to the spaces between the parallel lines on the bill which are to be examined. The lines may be, but do not have to be, larger than the spaces between the lines on the bill. The mask contains parallel lines even if the area of the bill to be surveyed has cross-hatching on it. The defendant's machine contains a mask or reticle consisting of a series of parallel lines which correspond in width to the spaces between the lines which are to be examined. The mask or reticle in defendant's machine is not a photonegative and does not show cross-hatching which occurs in the area examined. The mask or reticle in defendant's machine is the same as and serves the same function as the mask or reticle in Selgin II.

74. a. In Selgin II, the shifter consists of the motor and cams which move the mirror in two directions, thus moving the image of the bill relative to the mask in two directions. One direction of motion compensates for irregularities in the placement of the bill in the machine and in the size of the bill and insures that the image of the lines on the bill is properly aligned with the lines on the reticle. The second direction of movement in-

sures that, given proper alignment, the lines on the bill pass over the lines on the reticle.

b. In defendant's machine, the platform onto which the bill passes for examination is so constructed as to automatically place the lines on the bill and the lines on the reticle in proper alignment. The reticle is suspended in a tube which holds it directly above the portions of the bill to be examined. A spring causes the tube, and hence the reticle, to move across the bill, thus causing the image of the lines on the bill to move across the lines on the reticle.

c. It was known, prior to the filing of Selgin II, that one direction of movement could be eliminated when the bill was properly placed in relation to the reticle or mask. (See Selgin I, column 3, lines 68–72). Attaching a spring to the reticle was an obvious substitute for motor driven movement at the time when Selgin II was filed.

d. The platform and spring driven tube in defendant's machine perform the same function, i. e., insuring that the lines on the bill will be made to pass over the lines on the reticle in proper alignment, as does the shifter in Selgin II. The means used by defendant were a known substitute for the means employed in the preferred embodiment of Selgin II at the time Selgin II was filed.

75. In Selgin II, the image of the lines on the bill is projected onto the reticle by means of a system of lenses and a mirror. In defendant's machine, the image of the lines on the bill is transmitted to the reticle by placing the reticle in a position directly above and almost in contact with the bill itself. It was known prior to the filing of Selgin II that the system of lenses used in the preferred embodiment of Selgin II could be dispensed with and the bill and reticle placed in physical proximity to each other. (See Selgin I, column 3, lines 65–68.) The physical positioning of mask and bill in defendant's machine performs the same function as the lens system in Selgin II. The means used in defendant's machine were a known substitute for the means shown in the preferred embodiment of Selgin II at the time when Selgin II was filed.

76. Selgin II requires the use of photo-electric means for converting the light which passes through the mask or reticle into a series of corresponding electrical impulses. Defendant's machine uses a solar cell, a device invented after Selgin II was filed. A solar cell converts light which falls upon it into corresponding electronic impulses. For the purposes of the invention, the solar cell performs exactly the same function as the photocell required by Selgin II.

77. a. According to Claim 1 of Selgin II, the circuit means or electronic brain of Selgin II is tuned to transmit a signal to peripheral equipment whenever the frequency and amplitude of the electronic signal coming from the photo-electric cell indicates that a valid bill has been introduced. The electronic brain in Selgin II is tuned so as not to respond to the relatively lower frequency variations produced solely by the movement of the shifter (compare Ex. 6, Fig. 6 [a], with Ex. 6, Fig. 6 [b] and Ex. 6, Fig. 4) but only to the relatively higher frequency variations in the signal produced by Moiré interference. According to Claim 4, said circuit means may be constructed so that when a signal of the proper frequency is introduced, the signal will resonate within the circuit, causing it to increase in amplitude. When the frequency and amplitude of the original signal are correct, resonance in the circuit will build to a predetermined amplitude, which will trigger a signal to peripheral equipment.

b. The circuit means or electronic brain in defendant's machine consists of a band pass amplifier and integrator. The electronic brain in defendant's machine is also tuned so as to respond only to the frequencies pro-

484

duced by Moiré interference. The electronic brain in defendant's machine accumulates the charges which result from reception of the signals produced by Moiré interference until the accumulated charge reaches a predetermined level. Peripheral equipment is then signaled that a valid bill has been accepted.

c. The use of an amplifier and integrator was a known method of recognizing high frequency signals at the time when Selgin II was filed. (See Sontheimer, column 6, lines 8–26.) The electronic brain used to determine the presence of the signals produced by Moiré interference in defendant's machine serves the same function as the electronic brain in Selgin II. The means used in defendant's machine were a known equivalent to the means used in the preferred embodiment of Selgin II at the time when Selgin II was filed.

## VII. DAMAGES

78. Defendant's currency validator employs many means for detecting counterfeit currency, but of these, the most important is the one which employs the Selgin II invention. Without this portion of the device, the machine would have no commercial application.

79. Most currency validators contain more than one means of detecting counterfeit currency.

80. Since the Selgin II invention provides the most essential test of any employed by the defendants, a reasonable royalty should be measured by the total selling price of the machine rather than by the cost of one or more elements of the machine.

81. Under the circumstances of the case and in view of the fact that the royalty will be based on the total selling price of the defendant's machines, a reasonable royalty for past infringement by each defendant is four percent (4%) of the sum received for each machine.

82. This is not an exceptional case, justifying the award of either attorneys' fees or increased damages.

*Conclusions of Law*

1. The Court has jurisdiction over the parties and the subject matter and venue is properly laid.

■ 2. United States Patent No. 2,964,641, referred to herein as Selgin II, is valid.

■ 3. Defendant's machine infringes Claims 1, 4 and 5 of United States Patent No. 2,964,641, referred to herein as Selgin II.

4. Judgment should be entered for plaintiff and against defendants Pacific Nik-O-Lok Co., Inc., and ARDAC, jointly, in the amount of $5.71.

5. Judgment should be entered for plaintiff and against defendants Advance Automatic Sales Co., Inc., and ARDAC, jointly, in the amount of $5.71.

6. Judgment should be entered for plaintiff and against defendants Standard Change Makers, Inc., and ARDAC, jointly, in the amount of $84,311.28.

7. Judgment should be entered for plaintiff and against defendant ARDAC in the amount of $112,344.38. In no case should the total amount which plaintiff collects from defendant ARDAC exceed $150,254.44.

8. Plaintiff should collect costs and seven percent (7%) interest on the judgment from the date thereof.

9. An injunction should issue restraining defendants and their agents and privies from further violation of United States Patent No. 2,964,641.

*Judgment for Damages and Injunction*

This cause having been considered by this Court upon the pleadings and evidence presented on trial and upon the briefs of the parties submitted on defendant's Motion for Reconsideration, it is:

ORDERED, ADJUDGED, AND DECREED:

1. United States Patent No. 2,964,641 is valid as to all its claims and plaintiff

is the lawful owner thereof with the right to recover for past infringement thereof.

2. Defendants and each of them have infringed Claims 1, 4 and 5 of Letters Patent No. 2,964,641.

3. A writ of injunction shall issue out of and under the seal of this Court directed to the defendants and each of them and their officers, agents, attorneys, employees, associates, and privies, enjoining and restraining them and each of them from infringing Claims 1, 4 and 5 of Letters Patent 2,964,641 during its term without a license from plaintiff.

4. Plaintiff shall recover damages for infringement of the patent in the following amounts:

  a. From Pacific Nik-O-Lok Co., Inc., and ARDAC, jointly, in the amount of $5.71.

  b. From Advance Automatic Sales Co., Inc., and ARDAC, jointly, in the amount of $5.71.

  c. From Standard Change Makers, Inc., and ARDAC, jointly, in the amount of $84,311.28.

  d. From ARDAC in the amount of $112,344.38.

5. In no case shall the total amount which plaintiff collects from defendant ARDAC exceed $150,254.44.

6. Plaintiff shall recover costs and interest on the judgment at the rate of seven percent (7%) per annum from the date hereof.

7. United States Patent No. 3,256,928, issued June 21, 1966, to John B. Riddle and Robert B. McLaughlin is invalid and void as to Claims 1–3 and 5–11 thereof. Defendants do not infringe Claims 4 and 12–17 of said patent.

8. Counsel for plaintiff shall promptly prepare, serve and submit a permanent injunction for approval and issuance by the Court in accordance with the foregoing Findings and Conclusions.

Dated: July 14, 1972.