**Application of Lewis A. WAY et al.**

**Patent Appeal No. 74–618.**

United States Court of Customs
and Patent Appeals.

May 1, 1975.

Eugene F. Buell, Buell, Blenko & Ziesenheim, Pittsburgh, Pa., attorneys of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Fred E. McKelvey, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, LANE and MILLER, Judges, and ALMOND, Senior Judge.

RICH, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Board of Appeals affirming the rejection under 35 U.S.C. § 103 of claims 1–3 and 5 in application serial No. 36,406, filed May 11, 1970, for "METAL WORKING APPARATUS AND METHODS OF PIERCING." We reverse.

The invention relates to the manufacture of seamless metal tubing by rolling a round bar or billet of steel over a piercer point. Fig. 30–21 of *The Making, Shaping and Treating of Steel* (1964 ed.) at 846 (hereinafter Steel I), a prior art reference, depicts the process (reference numerals ours):

Fig. 30–21. Sketch illustrating action of different parts of Mannesmann piercer in the piercing of a solid billet.

The rollers 1 and 2 urge the heated (2200–2300°F.) billet 3 over the piercer point 4. Claims 1 and 5 are the independent claims on appeal:

1. A method of piercing metal members, particularly members containing slag inclusions comprising the steps of urging said member at a

temperature above about 1750°F. over a piercer point by rolling whereby said point passes through and forms an axial opening in the ingot, said point being formed of an alloy consisting essentially of about 0.015% to 2% carbon, about 5% to 65% cobalt, about 15% to 35% chromium and about up to 30% iron.

5. In a metal piercing apparatus for piercing elongated metal members at elevated temperatures the combination of at least two spaced apart cooperating rolls and a generally conical piercer point generally between said spaced rolls, said point being composed of an alloy, consisting essentially of about 0.015% to 2% carbon, about 5% to 65% cobalt, about 15% to 35% chromium and up to 30% iron.

The novelty in both the method and apparatus resides in the composition of the piercer point alloy.

### The References

The references relied upon by the board are:

| | | |
|---|---|---|
| Davis et al. (Davis) | 2,197,098 | April 16, 1940 |
| Steel I, supra | | |
| Wissler | 1,903,952 | April 18, 1933 |
| Nowak | 2,799,003 | July 9, 1957 |
| Van Nostrand's Scientific Encyclopedia 1388 | | |
| (1947 ed.) | | |
| The Making, Shaping and Treating of Steel 878 | | |
| (1964 ed.) (hereinafter Steel II) | | |

Davis describes piercer points of ferrous alloys for use in seamless tube mills. Steel I discloses the manufacture of seamless tubing in a Mannesmann piercing mill, the type of metal-piercing apparatus in which, according to the specification, appellants' invention is used.

Wissler discloses alloys for welding rods containing 15–45% chromium, 2–35% tungsten, and 20–65% cobalt, with little iron (the examples show 0–30%).

The reference further states:

The alloys are also useful for a great many other purposes where a high degree of resistance to abrasion is required, and they have been used with marked success for the cutting edges of oilwell drills; the wearing parts of rock, ore, and other crushers; forging, upsetting and drawing dies; * * *.

Nowak discloses a radioactive electrode for use in electrical geophysical prospecting or well-logging methods, fabricated of a Stellite alloy containing 40–80% cobalt 60 (a radio-isotope of cobalt), 20–35% chromium, 0–25% tungsten, and 0.75–2.5% carbon.

Van Nostrand defines "Stellite" as:

* * * A non-ferrous alloy containing 25–40% chromium, 40–80% cobalt, 0–25% tungsten, 0.75–4% carbon, and smaller amounts of iron, manganese, and silicon. It is hard and unmachinable as case and must be finished by grinding. In addition to its high hardness and red hardness which make it useful as a cutting tool material, it has excellent corrosion-resistance which is a requirement for applications such as surgical instruments and polished mirrors in optical instruments.

Steel II states in part:

Dies [for extrusion] of harder materials [than 10% tungsten and 5% chromium steels], and steel dies with hard facings such as stellite, have been tried experimentally but have not as yet proved successful.

### Appellants' Affidavits

■ Appellants introduced three affidavits[1] during prosecution, from Franceschina; Nedley, Cotton, and Watson; and Ruff.

Franceschina says:

The normal use of the term "tools" is primarily with respect to cutting tools

---

[1]. The statements of Franceschina and Ruff do not show that they were made under oath before the notaries whose seals and signatures are affixed thereto. However, Rule 132, under which these statements were presumably received (the record does not reveal the circumstances of receipt; see MPEP 716), permits receipt of "declarations" as well as statements made under oath. Since the PTO made no objection to the form of the Franceschina and Ruff statements, it has waived any requirement that these statements be made under oath before they are accorded evidentiary status.

such as cut-off parting tools, or shaped or formed tools for the removal of metal in processes such as machining. To the contrary, seamless "tools" do not remove metal, but are used primarily for the shaping or guiding of the heated product through the piercing and rolling process.

In my 21 years experience in making seamless pipe I have found that the metal analyses generally used as "tools" in cutting, piercing of sheet metals, die forming, drawing, blanking, etc., are not successful in the making of "tools" for processing of seamless pipe. The "tools" to form and make seamless pipe are quite different in chemistry from those generally known as "tools".

The Nedley, Cotton, and Watson affidavit confirms this and continues:

Over the years a number of so called "tool" steels, including "Haynes Stellites", have been experimented with in the piercing operation and have proven unsatisfactory. The instruments used to produce seamless tubes are of a different chemistry than tools that are used to remove portions of metal from a basic body or to form cold metals.

Ruff's statement indicates that

* * * many chemistries [for "seamless tools," used for piercing and rolling,] have been tried with no significant improvement in service life experienced. Hard coatings of various types have proved, in most cases, detrimental. Apparently the application is of a nature not similar to cold working[2] and cutting operations, for the solutions that have worked well in this area have proved unsuccessful to date.

The Examiner's Answer does not mention these affidavits; the board noted only the Franceschina affidavit.

### The Board Opinion

In affirming the rejection of claims 1–3 and 5 as obvious to a person of ordinary skill in the art, the board held that it would be obvious to use the alloys disclosed in Wissler and Nowak in piercer points in the process and apparatus for making seamless metal tubing described by Davis and Steel I. We set forth the relevant portion of the board's opinion in full (emphasis in original):

We initially note that appellants' method claims are directed to a method of piercing metal members, which comprises the step " . . . urging said member at a temperature *above about* 175° [sic, 1750°] F over a piercer point by rolling . . .." (Emphasis added.) The remainder of the claims is directed to a particular alloy of which the piercer point has been formed. We consider this process to be the same as that disclosed by Davis et al. and "Steel [I]." We specifically note Figure 30–21 of "Steel [I]" along with the temperature of 2200 to 2300°F recited therein. The alloy of which the piercer point is made is a limitation directed to the features of the particular piercer employed in the process and hence is entitled to little weight in patentably distinguishing from the references. It is well settled that patentability of method claims cannot be predicated on apparatus limitations. Stalego et al. v. Heymes et al., 46 CCPA 772, 263 F.2d 334, 120 U.S.P.Q. 473.

Assuming, *arguendo,* that the particular alloy defined in the claims is of patentable significance, as argued by appellants, then we agree with the examiner that it would have been obvious to form the alloys of the secondary references into metal working tools of the type and shape disclosed in the basic references of Davis et al. and "Steel [I]." We are not impressed by appellants' argument that the Wissler reference is directed to a welding rod or that it is of a non-analogous art. Although one of the uses of the alloy of Wissler has been disclosed as a welding rod, we note that the refer-

---

2. "Cold working" was defined at oral argument to include cold forging and machining.

ence in discussing the alloys disclosed therein * * * states:

> "The alloys are *also* useful for a great many *other* purposes where a *high degree of resistance to abrasion* is required, and they have been used with marked success for the cutting edges of oilwell drills; . . . *forging,* upsetting and drawing dies; . . .." (Emphasis added.)

Thus, we find that Wissler is *also* directed to a *forging* member as distinguished from a cutting member. Appellants' piercer appears to us to fall within the general art of forging. Although the primary purpose for the alloy of Wissler may be welding rods and thus appears to be of a non-analogous nature to the instant invention, we consider the reference to *forging* therein to carry far greater weight. The functional overlays [sic] and similarities of forging and piercing as disclosed in the instant application are readily apparent, and we therefore conclude that, at the very least, the arts to which Wissler, Davis et al. and "Steel [I]" belong are reasonably pertinent to the art with which appellants' invention deals. (See In re Ellis, Cust. & Pat. App., 476 F.2d 1370, 177 U.S. P.Q. 526.) Furthermore, since the alloys of Nowak and Wissler are "Stellites," they are clearly analogous. We have noted the affidavit of L. E. Franceschina. Although the affidavit attempts to define the meaning of "tools" and distinguish rolling, piercing and cutting, the affidavit does not state that "Stellite" may *not* be useful or has *not* been employed in the tube-forming or forging arts. Although the Van Nostrand reference defines this material as useful as a cutting-tool material, it does not state that it cannot be employed in other types of tools. In fact, by its reference to red hardness it implies that the cutting-tool material is operable under conditions of temperature as claimed by appellants, and thus not limited to a severing operation such as described in the affidavit. In this regard, we note that a complete reading of the refer-

ence [Steel II], employed by the examiner in the rejection, discusses * * the fact that

> "Dies [for extrusion] of harder materials, and steel dies with hard facings such as *stellite,* have been tried experimentally but have not as yet proved successful." (Emphasis added.)

We consider this as a disclosure of the use of Stellite in tools employed to form tubular products and thus not *solely* of a prior use for *cutting-tool-material* as argued by appellants. Though we note that this publication has stated "but have not as yet proved successful," we also note that it did not state that the Stellites proved unsuccessful.

## OPINION

■ The principal references, Davis and Steel I, merely show the acknowledged prior art processes and apparatus for piercing hot billets to make seamless tubing upon which appellants have improved. The improvement resides solely in the composition of the alloy from which the piercer point is made. No other assertion of novelty is made. The solicitor's brief admits that "neither reference discloses a piercing point made from the alloy * * * mentioned in the claims."

The PTO position is that it would have been obvious at the time the invention was made to one of ordinary skill in the art to use an alloy within the ambit of the appealed claims. This allegation of obviousness is predicated on the disclosures of the secondary references, Wissler, Van Nostrand, Nowak, and Steel II.

None of the secondary references has anything to do with tube making or piercer points or anything of a truly analogous nature. Piercer points obviously involve problems of a special nature not encountered in such operations as forging and drawing, contrary to the solicitor's unsupported assertion to the contrary, operating as they do inside a red-hot billet. The specification discloses that the invention results in piercer

points which last much longer in use than conventional points. It concludes with a theory, as follows:

We believe that the peculiar properties of our piercer method and metal working members comes from the formation of a cobalt oxide or cobalt-chromium oxide film under high temperature and pressure which acts as a lubricant. Peculiarly no noticeable film of oxide is formed on heating to high temperatures but a dark film forms on working at the same temperatures, and only on that portion of the tool in contact with the work. * * The foregoing theory appears to be supported by the vastly improved and unique results of our invention, but it is at most a theory and we do not wish to be bound by it but rely on the unique result achieved regardless of theory.

It also says, in describing the composition as defined in claim 1, "we have found that cobalt is absolutely essential and that the carbon must be reduced as the iron content increases."

The solicitor's brief relies primarily on Wissler to show prima facie obviousness. In fact, considering that Davis and Steel I, mentioned in argument, merely show the *environment* of the invention, Wissler is the *only* reference the solicitor has relied on.

Wissler is a 1933 patent assigned to the Haynes Stellite Company and describes its invention as relating to "welding rods formed from certain alloys consisting essentially of cobalt, chromium and tungsten." The welding rods are to be used in "processes wherein metal is fused by the electric arc or the blowpipe flame and flowed into contact with heated solid metal for the purpose of welding, filling, armoring, sheathing, or the like." The part of the disclosure upon which the PTO relies—welding rods being far afield from appellants' invention—is the statement that "The alloys are also useful for a great many other purposes where a high degree of resistance to *abrasion* is required, and they have been used with marked success for

* * * *forging,* upsetting and *drawing dies* * * * and many other articles subject to extreme *abrasive* wear." (Emphasis ours.) The solicitor asserts it is "manifest" piercing points and drawing dies operate in an "analogous manner," in essence because they both operate in flowing contact with hot metal. We do not agree. There is no support for the analogy from the technical literature and a fertile imagination cannot make up for the lack thereof. We find Wissler does not make the claimed invention obvious.

Furthermore, the argument below was that appellants' piercer points, claimed for use in his process and apparatus, resemble a type of alloy broadly known as "Stellites." The Steel II reference, which the solicitor does not discuss, briefly mentions "extrusion tools" including extrusion dies. (The solicitor mistakenly calls them "forging dies.") The only relevant part of this reference is the following negative statement about "Stellite" alloys:

Dies of harder materials, and steel dies with hard facings such as stellite, have been tried experimentally but have not as yet proved successful.

This is in accord with the Nedley et al. "affidavit" of record, supra, in which men highly skilled in metal piercing also explained that "Haynes Stellites," experimented with in piercing operations, "have proven unsatisfactory."

We find that a holding of obviousness was not warranted on these prior art references.

The concurring opinion errs in its belief that we have, *sub silentio,* overruled In re Kanter, 55 CCPA 1395, 399 F.2d 249 (1968). The "alloy" of which the piercer point is made is the inventive contribution to an otherwise old process of making seamless *tubing.* The alloy is no part of the tubing. In *Kanter* the alloy was merely a known material which was *being casehardened* by a known process, which happened to work better on that alloy than it did on other alloys. A new *product* resulted, claims

to which the PTO had allowed, but there was no novelty anywhere in the *process.* Another distinction between this case and *Kanter* is that the material in *Kanter* was not new, but old. Although the alloy employed by appellants here was known, the piercer point itself was new. In re Kuehl, Cust. & Pat.App., 475 F.2d 658 (CCPA 1973), is not inconsistent with *Kanter.* In *Kuehl* the use of a new and unobvious zeolite catalyst made a hydrocarbon conversion process patentable as well, even though the catalyst, once it was known by virtue of Kuehl's disclosure, found obvious use in the process. A catalyst is an active element in a process, not merely a material treated as in *Kanter.* The piercer point in appellants' process is also an active element, and is *the* novel feature of the apparatus. Thus, this case resembles *Kuehl* and not *Kanter.* We do not here "complete" the overruling of *Kanter* because we have never begun to do so.

The decision of the board is reversed.

Reversed.

MILLER, Judge (concurring).

Although I agree with the result reached by the majority, the opinion fails to recognize a consequence of the decision in light of the statement: "The improvement resides solely in the composition of the alloy from which the piercer point is made."

As in In re Kanter, 55 CCPA 1395, 399 F.2d 249 (1968), the composition of the alloy is not new; and the only novelty lies in the use of the known alloy in the piercer point used in a known process (and known apparatus).[1] *Kanter* affirmed the rejection of a process of siliconizing a ferrous metal core of a particular type alloy which was known but not previously used in the siliconizing process.[2] See In re Mancy, 499 F.2d 1289, 1293 n. 4, (CCPA 1974). In essence,

*Kanter* involved a new, useful, and unobvious product made by an old process using a *known* starting material (the alloy) which had not been used previously in the process. Without relying on any reference to show the obviousness of selecting the particular type alloy for use in the claimed process, the court said:

> The selection of the starting material was, presumably, *not* obvious but such selection is not a category of patentable invention. 35 U.S.C. § 100. [Emphasis supplied.]

Five years later, however, in In re Kuehl, 475 F.2d 658 (CCPA 1973), this court stated that use of a catalyst in a claimed process is part of "the subject matter as a whole" to be considered in determining the question of obviousness under 35 U.S.C. § 103. "Use," of course, requires *selection* for use, and whether the selection be of a starting material or a catalyst, it would still be part of the "subject matter as a whole."

Thus, the majority opinion completes the overruling of *Kanter* begun by *Kuehl*—insofar as *Kanter* would deny patentability to a process in which the improvement resides solely in the unobvious use of a selected known (and claimed) material.

Although the alloy in *Kantor* became part of the product of the claimed process, whereas the alloy here does not, the decisive fact remains that in each case the process is novel because an alloy, never before used in the process, is used in a claimed step of the process. Concentrating only on the manipulative steps of claimed subject matter as *the* "process" without considering the materials used in the "process" would neglect a limitation in a claim and the "subject matter as a whole" principle. 35 U.S.C. § 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

---

1. Piercer points, as such, are *not* new in the known process (and known apparatus).

2. The Patent Office had allowed claims to the particular type alloy with the silicon coating,

but refused to allow the process of siliconizing the alloy.