**MEDTRONIC, INC., Plaintiff,**

v.

**CATALYST RESEARCH CORPORATION,**
**Defendant.**

**No. 4–77–Civ. 201.**

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 18, 1982.

---

Robert O. Vidas, Schroeder, Siegfried, Vidas, Steffey & Arrett, and Lawrence Brown, Faegre & Benson, Minneapolis, Minn., for plaintiff.

Berj. A. Terzian, Pennie & Edmonds, New York City, and Ronald J. Brown, Dorsey & Whitney, Minneapolis, Minn., for defendant.

## MEMORANDUM ORDER

LARSON, Senior District Judge.

The motions pending for consideration by this Court require the Court to evaluate various contentions regarding the validity and enforceability of the two patents in suit, the Moser patent, U.S. Patent No. 3,660,163, and the Schneider patent, U.S. Patent No. 3,674,562, the infringement of those patents by plaintiff Medtronic, Inc., and the amount of damages required to compensate defendant Catalyst Research Corporation (CRC), the owner of the two patents, for plaintiff's infringement. Much of the factual background to this action has been recounted by the Court in previous Orders.[1] Specifically before the Court at

---

1. These Orders pertained to Count III of plaintiff's Amended and Supplemented Complaint, which has been referred to as the "contract portion" of this action. *See, e.g., Medtronic,*

this time are plaintiff's motion for judgment notwithstanding the verdict or in the alternative for a new trial, plaintiff's motion for a judicial license under the Moser and Schneider patents, and defendant's motion for prejudgment interest in the amount of $297,032.74.

This suit was originally commenced by plaintiff in June 1977, bringing to an end discussions that had been taking place between the parties regarding a patent license under the Moser and Schneider patents. Plaintiff sought a declaratory judgment that defendant's patents were invalid and not infringed by plaintiff. Defendant counterclaimed alleging patent infringement, and in 1980 initiated two foreign patent infringement actions against plaintiff. Plaintiff was then granted leave to amend its complaint to add a breach of contract claim and to supplement its validity and infringement allegations, *see Medtronic, Inc. v. Catalyst Research Corp.*, 518 F.Supp. 946, 956 (D.Minn., 1981), and on May 7, 1981, filed its Amended and Supplemented Complaint. Counts I and II of that complaint form the basis of the issues to be decided here. Count I deals with the Moser patent; Count II, the Schneider patent.

Prior to trial, defendant voluntarily filed a reissue application for the Schneider patent to delete example III, which in the course of the litigation was found to contain a typographical error. This Court denied plaintiff's motion for an Order compelling the defendant to submit the Moser patent for similar proceedings, *see Medtronic, Inc. v. Catalyst Research Corp.*, No. 4–77–Civ. 201, Memorandum Order (D.Minn., filed November 3, 1981), and on April 22, 1982, ruled on various summary judgment motions relating to the government's right or title to the patents in suit. *See Medtronic, Inc. v. Catalyst Research Corp.*, No. 4–77–Civ. 201, Memorandum Order (D.Minn., filed April 22, 1982). The Court held that the government's royalty-free license to the Schneider invention did not extend to Medi-

care or Medicaid funded purchases of pacemakers that incorporated infringing batteries, and further ruled that plaintiff's allegation that the government had equitable title in and to the patents in suit was insufficient as a matter of law as a defense to defendant's infringement counterclaim. Although plaintiff sought leave to amend its complaint a second time to allege that the government had legal title to the Moser patent, the Court denied this request on the ground that "to do so would create unwarranted delays and would infuse another complex issue into an already complex patent case." *Id.*, slip op. at 7.

■ Because of this complexity, the Court agreed with counsel's suggestion at the pretrial conference to bifurcate the trial into two segments: the first, a trial on the question of patent validity, enforceability, and infringement, and the second, a damages trial. Accordingly, on May 24, 1982, trial on the substantive patent claims commenced. Plaintiff Medtronic presented the testimony of a total of 19 witnesses; defendant CRC called 11 witnesses for its portion of the case. On June 11, plaintiff provisionally rested, and the Court granted defendant's motion for a directed verdict as to those aspects of plaintiff's Amended and Supplemented Complaint that plaintiff agreed to remove or eliminate. *See* Tr. XI–1; XIV–108 to –143. At the close of the evidence, after approximately four weeks of testimony, the Court granted plaintiff's motion for a directed verdict on defendant's claim of willful infringement and granted defendant's motion for a directed verdict on plaintiff's claim of anticipation. In the Court's view, plaintiff had failed to submit evidence that the Moser and Schneider patents were anticipated by the prior art or lacked novelty pursuant to 35 U.S.C. § 102. An invention is new or novel unless a single prior art reference includes every element found in the invention at issue. The Hermann patent is the closest prior art to the Moser and Schneider

*Inc. v. Catalyst Research Corp.*, 518 F.Supp. 946 (D.Minn., 1981), *aff'd*, 664 F.2d 660 (8th Cir. 1981); *id.*, Memorandum Order (D.Minn.,

filed May 18, 1982); *id.*, Memorandum Order & Order for Permanent Injunction (D.Minn., filed July 12, 1982).

inventions, but this patent does not disclose the inventions of Moser and Schneider in such full, clear, and exact terms that one skilled in the art could construct and practice either of these inventions without having to use the Moser and Schneider teachings or some inventive skill. *See E. I. duPont de Nemours & Co. v. Berkley & Co.,* 620 F.2d 1247, 1261 (8th Cir. 1980); *Phillips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronics Industries, Inc.,* 450 F.2d 1164, 1169 (3rd Cir. 1971). The Moser and Schneider patents are thus not invalid for lack of novelty.

■ Similarly, the evidence did not support a finding of willful infringement in this case. The issue of willful infringement is relevant only to the question of whether increased or treble damages should be awarded by the Court pursuant to 35 U.S.C. § 284. Such increased damages are within the Court's discretion to award, *see Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 665 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 610 (1980), but are only warranted upon a clear showing of willful and deliberate infringement. *See Western Electric Co. v. Stewart-Warner Corp.,* 631 F.2d 333, 336–38 (4th Cir. 1980), *cert. denied,* 450 U.S. 971, 101 S.Ct. 1492, 67 L.Ed.2d 622 (1981); *Leesona Corp. v. United States,* 599 F.2d 958, 969–70 (Ct.Cl.), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). When the issues are close, fairly debatable, and litigated in good faith, a finding of willful infringement is not warranted. *See id.; Deere & Co. v. International Harvester Co.,* 658 F.2d 1137, 1146–47 (7th Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 514, 70 L.Ed.2d 386 (1981). The evidence is clear that Medtronic had an honest doubt as to the validity of the patents in this case. Indeed, in the Court's view, the question of patent validity is a close and difficult one. Because the cooking process used by Medtronic changes the chemical composition of its batteries, the

issue of infringement is also debatable. Moreover, Medtronic officials believed that the June 25, 1976 Agreement between the parties allowed Medtronic to go forward and manufacture lithium-iodine batteries using the Greatbatch technology, free from interference by CRC.[2] Although the jury's finding on the willfulness issue is advisory in any case, *see White v. Mar-Bel, Inc.,* 509 F.2d 287, 292 (5th Cir. 1975), on this record the Court believed that reasonable persons could not have found that plaintiff acted deliberately and in bad faith, without any regard for the patent rights of CRC. *Compare Saf-Guard Products, Inc. v. Service Parts, Inc.,* 491 F.Supp. 996, 1004–05; 1011–12 (D.Ariz.1980) (court held that because "the defendants in this case have from the outset taken a completely untenable position regarding the validity of the litigated patent," treble damages were justified). Hence, the willfulness issue was not submitted to the jury.

A total of twelve special verdict questions were submitted to the jury, however, and on June 24, 1982, the jury returned its verdict with all questions answered in favor of defendant. Testimony on the damages aspect of the case was subsequently presented. On June 30, 1982, the jury determined that CRC had suffered $5,066,900 in damages as a result of Medtronic's infringement of the Moser and Schneider patents. The motions now before the Court followed the Order for Judgment entered July 12, 1982, pursuant to the jury's special verdict answers.

■ In its motion for judgment notwithstanding the verdict, plaintiff contends that the Court erred in not granting its motion for a directed verdict on all issues pertaining to validity, enforceability, and infringement of the Moser and Schneider patents. This motion must be determined in accordance with the well-established standards for judgment notwithstanding

---

**2.** *See id.,* Memorandum Order, slip op. at 18–20 (D.Minn., filed May 18, 1982). The Court excluded any testimony on this issue from the substantive portion of the patent trial, in large part to avoid retrying the contract case, but the Court believes the contract is relevant to the willfulness issue.

the verdict pursuant to Fed.R.Civ.P. 50(b). Motions for judgment n. o. v. "should be sparingly granted," see Cleverly v. Western Electric Co., 594 F.2d 638, 641 (8th Cir. 1979), and are justified only when the evidence, granting the prevailing party all reasonable inferences that can be drawn from it, simply fails to support the verdict. See Richardson v. Missouri Pacific Railroad Co., 677 F.2d 663, 665–66 (8th Cir. 1982); Tackett v. Kidder, 616 F.2d 1050, 1053 (8th Cir. 1980). Of course, as plaintiff notes, judgment n. o. v. may be more appropriate or justified in a complex patent case than in some other cases because of the nature of the patent law, particularly where there is a high probability of juror confusion or misunderstanding. Cf. Celotex Corp. v. United States Gypsum Co., 204 U.S.P.Q. 745, 747–48 (N.D.Ill.1979) (jury finding of nonobviousness set aside on grounds that the jury was misled and did not properly apply the law). Indeed, the Eighth Circuit has recently reiterated that the issue of obviousness is a question of law. See Span-Deck, Inc., v. Fabcon, Inc., 677 F.2d 1237, 1241 (8th Cir. 1982).

■ Medtronic's alternative request for a new trial is subject to a different standard. A new trial should be granted when the Court determines upon review of all the evidence that the jury's verdict, if upheld, would result in a miscarriage of justice. Fireman's Fund Insurance Co. v. Aalco Wrecking Co., 466 F.2d 179, 187 (8th Cir. 1972), cert. denied, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). In exercising its independent judgment in determining whether the verdict is against the clear weight of the evidence, the Court may disbelieve witnesses and grant a new trial even when there is substantial evidence to sustain the verdict, but the Court may not grant a new trial "merely because . . . other results are more reasonable." Id. at 186 (citing Tennant v. Peoria Union Ry., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944)). See Lincoln Carpet Mills, Inc. v.

Singer Co., 549 F.2d 80, 82 (8th Cir. 1977); Bates v. Hensley, 414 F.2d 1006, 1011 (8th Cir. 1969). With these standards in mind, the Court will review each of the contentions now before it.

## I. VALIDITY

■ The issue of patent validity is perhaps the most difficult one presented by plaintiff's motion. Plaintiff claims that the Moser and Schneider patents are invalid under 35 U.S.C. § 103 due to obviousness and under 35 U.S.C. § 112 due to the lack of a sufficient enabling disclosure and sufficiently definite claims. Although the question of obviousness is a matter of law, the test for obviousness requires the resolution of several underlying factual inquiries:

(1) the scope and content of the prior art;

(2) the differences between the prior art and the claim at issue; and

(3) the level of ordinary skill in the pertinent art.

Span-Deck, Inc. v. Fabcon, Inc., 677 F.2d at 1241 (and cases cited therein). Secondary considerations, such as commercial success of the invention or lack thereof, long felt but unresolved needs, failure of others to make such invention, and other similar factors may also be considered if the issue of obviousness is a close one. See id.; Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

In the Span-Deck case, supra, the Eighth Circuit engaged in an independent analysis of the underlying facts when a general verdict on the obviousness issue was returned by the jury. See Span-Deck, Inc. v. Fabcon, Inc., 677 F.2d at 1241–45. Although the court did not specifically direct that this approach be employed by district courts, it cited with approval a discussion by the Seventh Circuit in Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc., 619 F.2d 660, 667 (7th Cir.), cert. denied, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980), which would suggest that an independent analysis is desirable.[3]

---

**3.** The Seventh Circuit opinion suggests that special verdict questions to resolve specific contested issues as to the concrete facts be used, see 619 F.2d at 667, but this Court questions whether such detailed questions would aid in the determination of obviousness or

■ Plaintiff's challenge to the validity of the patents under section 112 requires the Court to evaluate the jury's verdict under the traditional substantial evidence standard for judgment n. o. v. Plaintiff contends that there is not a sufficient enabling disclosure in the Moser patent, that is, that the patent does not contain sufficient information to allow a person of ordinary skill in the art to make and use the best mode of the claimed invention without a great deal of trial and error or experimentation. The disclosure requirements also mandate that patent claims be sufficiently definite and not overbroad in that they must not claim more than what is disclosed in the specification. *See generally* 35 U.S.C. § 112; 37 C.F.R. § 171; Manual of Patent Examining Procedure (MPEP) § 706.03(8). Plaintiff challenges the validity of the Schneider patent on both these grounds. The Court will consider each of these contentions in turn.

### A. *The Moser Patent*

The Moser patent (Plaintiff's Exhibit 113) relates to a substantially anhydrous or liquid-free electrochemical cell having a solid lithium anode, a solid electronically conductive iodine cathode containing a charge transfer complex of an organic donor component and iodine, and a solid lithium iodide electrolyte. The patent contains seven examples and 21 claims. Claim 1 is the only independent claim: the remaining 20 claims are dependent.

Plaintiff argues that the Moser invention is obvious in view of the Hermann patent alone (Plaintiff's Exhibit 111) or the Hermann patent in combination with the Rao patent (Plaintiff's Exhibit 77). Both patents are relevant prior art in that both relate to battery chemistry, as the Moser patent does, and both were prior to the filing of the Moser patent application. *See In re Way*, 514 F.2d 1057, 1061–62 (Cust. & Pat.App.1975). The Rao patent was cited in the Moser application, and the patent

examiner, Anthony Skapars, initially rejected the original Moser claims on the basis of Rao. The examiner eventually found patentable differences between Rao and the amended Moser claims, however, which entitles the patent to a presumption of validity with respect to the Rao invention.

■ The Hermann patent had not been issued when the Moser application was initially filed on June 1, 1970. CRC knew of the pending Hermann application (Plaintiff's Exhibit 50), but did not cite it in the Moser application, choosing instead to cite two articles by the same group of inventors at the California Institute Research Foundation (Plaintiff's Exhibits 49 and 59). There was a great deal of testimony at trial concerning whether the examiner nevertheless evaluated the Moser claims in view of the Hermann application, because Mr. Skapars was the examiner on the Hermann patent and because his field of search included classifications that the Hermann patent was filed under in the Patent Office files. The Court is aware that there is an assumption that the Patent Office properly performs its administrative functions, *see E. I. duPont de Nemours & Co. v. Berkley & Co.*, 620 F.2d at 1266, and that the presumption of validity extends to all references classified in areas searched by the examiner, absent contrary evidence, *see id.* at 1267, and the jury was so instructed. In this Court's opinion, it is unrealistic to assume either that a busy examiner retains the details of every pending file when reviewing a particular application or that an examiner carefully considers all relevant prior art in the field search if this art is not pointed out by the applicant, *see, e.g.,* MPEP § 2001.06(b) (citing *Armour & Co. v. Swift & Co.*, 175 U.S.P.Q. 70, 79 (7th Cir. 1972)); MPEP § 2011 at 527 (citing *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 175 U.S.P.Q. 260 (S.D.Fla.1972), *aff'd,* 178 U.S. P.Q. 577 (5th Cir. 1973), *cert. denied,* 414 U.S. 874, 94 S.Ct. 66, 38 L.Ed.2d 115 (1974)), but the Court respects the need for these

---

would merely confuse the jury and further complicate their task. The problem of submitting highly technical and complex questions—

in any fashion—to a lay jury remains a peculiar difficulty in patent cases.

assumptions if the presumption of validity is to be meaningfully applied.

In this case, the Hermann patent is clearly more relevant prior art than the other art cited by the patentee. The Rao patent teaches a lithium/iodine/carbon battery system, but unlike the Moser invention, the patent is directed to a low energy system and the preferred alternative taught by Rao uses silver iodide rather than lithium. No charge transfer complex is taught by Rao, and although Medtronic argues that carbon may be viewed as the functional equivalent to Moser's charge transfer complex, both Moser and Hermann teach the *addition* of carbon to improve conductivity. The Hermann patent generally discloses an active metal electrode, which includes lithium, and specifically mentions a lithium-magnesium alloy anode in example 13 of the patent. The electrolyte and cathode are the same as in the Moser invention. The Hermann articles cited by the applicant did not contain the example 13 disclosure of lithium-magnesium, but the patent teaches that a vapor source could be included to improve the operating characteristics of this battery system, which would be detrimental to the operation of the Moser invention because pure lithium is highly reactive with water.

The obviousness issue in this case thus is reduced to a question of whether a person of ordinary skill in the battery art would find it obvious to substitute a pure lithium anode in the Hermann battery. The level of ordinary skill in the battery art is very high: that of a PhD chemist or a person with considerable experience in the electrochemical battery art. Several Medtronic witnesses testified that in their view the use of lithium would be obvious based upon its highly reactive nature, which was well known. A former employee of CRC, Dr. Henry Goldsmith, also testified that "there was a lot of knowledge of lithium metal" as an anode material prior to the Moser invention, and "it came to my mind quite early, 'Why not lithium?'" Tr. VI–28. He further stated that "lithium would be a logical metal to go with" if the practical problems of containing it could be worked out. Tr.

VI–28 to –30. Of course, there is a difference between the potential for an effective system and the actual development of one. There was no evidence that anyone prior to Moser had perfected the lithium/lithium iodide/charge transfer complex battery system described in the patent.

The issue of obviousness is thus a close one in this instance and the Court must look to whether any secondary considerations tip the balance one way or the other. Both parties disagreed as to the role that commercial success should play in this regard. The Court instructed the jury that for commercial success to be considered as a factor in determining whether the Moser battery cell was obvious, there must be sales of the lithium-iodine batteries that are attributable to the patented features of the batteries. *See, e.g., Jacobson Brothers, Inc. v. United States*, 512 F.2d 1065, 1072–73 (Ct. Cl.1975). Medtronic strenuously argues that the commercial success of the lithium-iodine battery manufactured by Medtronic, CRC, and Wilson Greatbatch, Limited (WGL) for use in pacemakers was due to the "cooking" and "coating" processes patented by WGL, at least until the introduction of batteries using a 1979 patent (Plaintiff's Exhibit 141) by CRC. CRC acknowledges that the successful batteries were of the "cooked" and "coated" type that originated with WGL, but claims that because these batteries also fall within the claims of the Moser patent, their commercial success is properly relied upon. The Court must disagree. The widespread use of lithium-iodine batteries was not due to the patented features of the Moser invention. Substantial sales simply were not generated until after WGL's processes significantly improved the life of the batteries. The jury was correctly instructed as to the application of secondary considerations in their determination of obviousness, however, and because the Court is not convinced that the jury was misled by "a very skillful presentation of [this] secondary evidence," *Celotex Corp. v. United States Gypsum Co.*, 204 U.S.P.Q. at 747, the Court simply must return to the three basic factual inquiries

noted above to determine the obviousness issue.

Upon careful consideration of the arguments presented by Medtronic in its post-trial motion, the Court concludes that the Moser invention, although suggested by the prior art, was nonobvious. Examiner Skapars allowed the Moser claims over the Rao patent, and although there was much testimony that the idea of substituting pure lithium for the Hermann anode would have occurred naturally to an electrochemist at the time the invention was made, there was also testimony that the electrochemical battery art is such that theoretical predictions are often not borne out in practice. Moreover, Hermann taught that water vapor improved the performance of the lithium-magnesium example 13 cell, a teaching that would lead away from the use of pure lithium. Finally, Rao's lithium/iodine teaching was discounted as unworkable by the patent owner, another indication that further efforts with lithium would not be productive.

Thus, although as plaintiff suggests, there are factual differences between the battery patent held to be valid in *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), and the Moser invention, the Court finds the analysis of *Adams* to be applicable in this case. *See id.* at 48–52, 86 S.Ct. at 712–14. Despite the existence of each of the elements of the Moser battery in the prior art, this art would not have encouraged their combination, and hence Moser's efforts resulted in a patentable invention or advance over the prior art. Medtronic's motion for judgment n. o. v. or in the alternative for a new trial on the grounds that the Moser invention was obvious must, therefore, be denied.

Plaintiff has also challenged the validity of the Moser patent for failing to contain an enabling disclosure of example VII, the best mode. Example VII does not provide any instructions regarding the method of polymerization required to achieve the putty-like or plastic cathode material described in the example, but there was evidence presented that the "plastic" description

alone was sufficient to teach those skilled in polymerization methods what type of polymer was to be prepared, as well as what concentration of monomer to initiator and what rate of addition should be used. Certainly, the patent could have provided more detail with respect to the polymerization process, and there appears to be some ambiguity as to what is meant by the word "parts," but the Court cannot conclude that the jury's finding that the patent contained a sufficient disclosure was unsupported. The law does not require that the patent specification describe all of the intricacies or incidental details of the invention. "[A] patent is directed to those skilled in the art and need only be in sufficient detail to enable them to practice the invention." *Leesona Corp. v. United States,* 599 F.2d at 901 (and cases cited therein). *See General Electric Co. v. Brenner,* 407 F.2d 1258, 1261 (D.C.Cir.1968); *In re Karnofsky,* 390 F.2d 994, 997 (Cust. & Pat.App.1968); *Reinke Manufacturing Co. v. Sidney Manufacturing Co.,* 446 F.Supp. 1056, 1064–65 (D.Neb. 1978), *aff'd,* 594 F.2d 644 (8th Cir. 1979). Medtronic simply failed to meet its burden of proof that the Moser patent description was insufficient to teach a person of ordinary skill in anionic polymerization how to make and use the example VII charge transfer complex. The jury's finding of validity in this regard thus may not be disturbed by this Court.

## B. *The Schneider Patent*

The Schneider patent (Plaintiff's Exhibit 115) was issued shortly after the Moser patent, and pertains solely to the cathode portion of the battery. The invention claimed in the Schneider patent, in general terms, is that the addition of excess iodine to the charge transfer complex of P2VP and iodine increases, rather than decreases, the conductivity of the lithium-iodine cell. The Court agrees with defendant CRC that the work of Hermann, either alone or in combination with the Wilson patent (Plaintiff's Exhibit 55) or the Wisdom patent (Plaintiff's Exhibit 73) does not render this discovery obvious as a matter of law. Both Wisdom and Wilson are directed to batter-

ies that contain liquid solution components, which are very different from the solid Schneider cathode and battery cell. The Wilson patent was cited by the examiner in allowing the Schneider claims, so the presumption of patentable differences between Schneider and Wilson applies. Moreover, the Schneider claims were granted by the examiner without any rejection, a very unusual occurrence.

There is some controversy over whether the examiner considered the Hermann patent in evaluating the Schneider patent claims as existed with the Moser patent *supra*. Even if the presumption of validity does not apply to Hermann, the Court finds there are patentable differences between the teachings of Hermann and the Schneider invention. Hermann discloses the combination of an organic and a halogen to form a charge transfer complex, and notes that the proportions may be varied considerably, but even Medtronic witnesses testified that the Schneider patent teaching of the addition of *excess* iodine produced a surprising or unusual result, because of the poor conductivity of iodine. Finally, the rejection of the Schneider claims in the reissue proceedings is not persuasive evidence of nonobviousness in this case. The Court instructed the jury that although the examiner's first Office Action in the reissue rejected all 12 Schneider claims on various grounds, including obviousness, this was not a final action, and the examiner could change his decision or completely reverse it as he now has. *See* 37 C.F.R. § 1.112. As in the case of the Hermann patent, even if the presumption of validity was weakened or destroyed by this Office Action, substantial evidence of nonobviousness was presented, and the Court concludes that the Schneider patent is nonobvious. The discovery that the addition of excess iodine improves the conductivity of the cell, when just the opposite result would be expected, constitutes an inventive advance over the prior art, in this Court's opinion.

There is also substantial evidence to support the jury's finding that the Schneider patent claims are not overbroad or indefinite under 35 U.S.C. § 112, although two arguments raised by Medtronic suggest that the question is a closer one than that presented under § 103. First, Medtronic alleges that there is insufficient support for the range of 2–15 molecules of iodine for each atom of nitrogen in the cathode materials. While Medtronic witnesses Drs. Swofford and Kolpin were unable to obtain a plastic material above the range of 2–7 using the procedures contained in example II, Dr. Forman, Medtronic's patent expert, conceded that there is no requirement that the patent contain experimental data or supporting examples for all of the claimed embodiments of the invention. *See generally In re Herschler*, 591 F.2d 693, 700–02 (Cust. & Pat.App.1979). One example and enumeration of the other embodiments in the specification is generally sufficient, and because the Schneider patent contains a disclosure of the utility of a ratio above 7, *see* col. 3, lines 53–57, the Court believes that the patent is not invalid for overclaiming. CRC is correct that the jury could have accepted the testimony of Dr. Schneider that he had completed experiments that supported the claimed range, even though no records were introduced in conjunction with this testimony[4] and no experimental data was available to support a range above 2–7 when the application was initially drafted. In sum, the jury's finding that the Schneider claims are not invalid for overclaiming is supported by sufficient evidence, and the Court must therefore deny Medtronic's motion for judgment n. o. v. or in the alternative for a new trial on this basis.

Medtronic's second assertion that the Schneider claims are not sufficiently definite because of the use of the word "plastic" must also fail. Section 112 requires patent claims to particularly point out and distinctly claim that which the inventor regards as his or her invention to "warn oth-

4. Many CRC records were destroyed by floods, and these records may have been included in those that were lost.

ers skilled in the art against infringement, and to enable them to benefit from the teachings of the patent." *Ellipse Corp. v. Ford Motor Co.,* 452 F.2d 163, 170 (7th Cir. 1971), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972). The term "plastic" is an important part of the Schneider invention, but the lack of a specific teaching of how to make the claimed 8–15 range is not fatal in this instance. The case cited by plaintiff, *General Electric Co. v. Wabash Appliance Corp.,* 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1938), is distinguishable from the present situation, in that the novelty of the Schneider invention is not in its plastic nature. *Compare id.* at 371, 58 S.Ct. at 902. Rather, in Schneider, the term is used to distinguish material that is covered by the patent from that which is not. Moreover, the evidence sustains the conclusion that those skilled in the art could appreciate what is meant by the term, and so be able to avoid infringing. Because the Schneider patent sets out what it is that is claimed to be new, *compare id.* at 369, 58 S.Ct. at 901–02, the Court finds that the patent meets the requirement of § 112 that the claims be definite. *See In re Goffe,* 542 F.2d 564, 565–567 (Cust. & Pat. App.1976); *In re Skoll,* 523 F.2d 1392, 1395–96 (Cust. & Pat.App.1975); *In re Spiller,* 500 F.2d 1170, 1180–81 (Cust. & Pat.App. 1974); *Ellipse Corp. v. Ford Motor Co.,* 452 F.2d at 170.

In sum, there is substantial evidence to support the jury's verdicts as to the validity of the Moser and Schneider patents under the disclosure provisions of the patent laws. Whether the jury's answers as to obviousness are considered under a substantial evidence standard or upon the Court's independent analysis of the factual aspects of the determination of nonobviousness, such a determination is supported for both patents as well. Neither judgment n. o. v. nor a new trial is warranted on these grounds. Because the Court holds that the Moser and Schneider patents are valid, the question of infringement must now be considered.

## II. INFRINGEMENT

Medtronic relies upon the doctrine of file wrapper estoppel in arguing that its batteries do not infringe claim 1 of the Moser patent as a matter of law.[5] The limitation of a *solid* anode and cathode was added to claim 1 during the prosecution of the Moser patent, *see* Plaintiff's Exhibit 114, but the prior art that the applicant was faced with was of a pourable liquid nature. The doctrine of file wrapper estoppel only limits the claims of a patent by that which was given up in order to gain their allowance by the Patent Office. *See, e.g., Nationwide Chemical Corp. v. Wright,* 584 F.2d 714, 718–20 (5th Cir. 1978); *John Zink v. National Airoil Burner Co.,* 613 F.2d 547, 556 (5th Cir. 1980). If the Medtronic batteries were made with a pourable liquid cathode, no infringement could be found, but the cathode materials, although they might contain a liquid phase, clearly are not liquids. The jury's answer to the special verdict question on infringement of the Moser patent is supported by the testimony and the samples of the cathode materials admitted into evidence: their finding that the cathode materials fell within the description contained in claim 1 may not be disturbed. *See Control Components, Inc. v. Valtek, Inc.,* 609 F.2d 763, 770 (5th Cir.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980).

Although the issue is more difficult, the record also supports a finding of infringement of the Schneider patent for most of the batteries manufactured by Medtronic. The Schneider patent contains the phrase "consists essentially of," which has a special meaning under the patent law.[6] These words are words of limitation

---

Claim 1 of the Moser patent reads as follows:

"1. A substantially anhydrous cell comprising a solid lithium anode, a solid lithium iodide electrolyte and a solid electronically conductive iodine cathode . containing a charge transfer complex of an organic donor component and iodine."

6. Claim 1 of the Schneider patent reads as follows:

"1. A plastic cathode consisting essentially of a mixture of iodine and a charge trans-

that leave the claim open to the inclusion of additional ingredients beyond those following the terms, but only if those ingredients do not materially alter the basic and novel characteristics of the claimed invention. *See In re Herz,* 537 F.2d 549, 551–52 (Cust. & Pat.App.1976); *In re East,* 495 F.2d 1361, 1366 (Cust. & Pat.App.1974); *Ex parte Davis,* 80 U.S.P.Q. 448, 450 (P.O.Bd.App.1948). A great deal of evidence was presented during the trial on the nature of the material contained in the Medtronic batteries after the cooking process. Although no one is sure exactly what material is produced by this process, the cathode apparently contains a third ingredient, a pyradinium iodide salt, which is not an organic donor component as is specified in claim 1 of the Schneider patent. The salt functions as an acceptor rather than a donor. The Medtronic cell does remain electronically, as opposed to ionically, conductive. There is no doubt that the cooked cathode is superior to the uncooked material of the Schneider patent in terms of performance, but the Court cannot on this record conclude as a matter of law that the presence of the salt changes the basic and novel characteristics of the cell. The Medtronic batteries are manufactured with exactly the same materials as described in the Schneider patent, and there was testimony that the cooking process merely speeds up reactions that naturally occur in the Schneider charge transfer complex. The experts differed in their opinions of the amounts of charge transfer complex and salt that existed in the Medtronic cathode; the jury resolved the issue in favor of CRC, and the Court will respect that resolution.

One aspect of the jury's determination is not supported by substantial evidence, however, as Dr. Schneider's own testimony demonstrates. The Court accordingly finds as a matter of law that there is no infringement of the Schneider patent by Medtronic's 50:1 cathode materials. This composition is simply not within the 2–15 range of the patent claims. The 15,531 batteries

shipped by Medtronic that were made using at 50:1 ratio are thus outside of the Schneider claims and damages should not have been awarded for these batteries, a fact the Court will discuss further when Medtronic's damages arguments are considered.

Medtronic's motion for judgment n. o. v. on the issue of infringement will thus be granted in part, as to infringement of the Schneider patent by the 50:1 ratio batteries. Otherwise, the jury's verdict finding infringement of both the Moser and the Schneider patents is supported by substantial evidence and cannot as a matter of law be disturbed. Moreover, because the Court's independent review of the evidence suggests that the verdicts as modified represents a just result, Medtronic's motion for a new trial on the infringement issue must also be denied.

## III. INEQUITABLE CONDUCT

 Even if the Moser and Schneider patents are valid and infringed, plaintiff argues that they are unenforceable because of CRC's inequitable conduct in failing to disclose to the Patent Office the pending Hermann application. The Court recognizes the importance of the duty of candor and good faith towards the Patent Office: proceedings are ex parte and the office must rely heavily on the information supplied and references cited by the inventors and their attorneys in examining patent applications. Applicants thus have a duty to disclose *any* information that they are aware of that is material to the examination of the patent application. The Court instructed the jury that:

"Information is material to the prosecution of a patent application if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. . . .

The burden is on the patentee to present the examiner with a complete and accu-

---

fer complex of iodine with an organic donor component selected from the group consisting of poly-2-vinylquinoline and poly-2-vinyl-

pyridine the mixture containing between 2 and 15 molecules of iodine for each atom of nitrogen."

rate record to support the allowance of the patent free from bad faith and inequitable conduct. The rule of absolute honesty, candor, and good faith disclosure should encourage the applicant, when the materiality of facts is in question, to resolve all doubts in favor of disclosure. An applicant is not obligated to disclose everything known about the prior art in order to meet the duty of disclosure, however, in order to constitute fraud or inequitable conduct the applicant's actions must involve some element of wrongfulness, willfulness, or bad faith. An honest or innocent mistake made in good faith does not render a patent invalid: a good faith judgment in light of accepted practices before the Patent Office is sufficient.

In this case, Medtronic has the burden of proving by clear and convincing evidence that Catalyst Research Corporation or its agents or employees were aware of material information and that this information was intentionally withheld from the Patent Office. If you find by clear and convincing evidence that CRC's conduct was inequitable or fraudulent, that is, that its conduct made it impossible for the patent examiner to fairly assess either the Moser or the Schneider patents, then the patents will be rendered invalid. A patent is invalid if acquired inequitably and contrary to public policies."

The debate over whether the examiner actually had the Hermann application before him when he was reviewing the claims of the Moser and Schneider patents is irrelevant to the determination of whether the patents are unenforceable, except insofar as a determination of materiality is concerned. The primary question in this case, however, is whether the application should have been cited by CRC based upon the law recited above. Surely the jury could have concluded that the reference should have been cited. CRC had knowledge of it, it was highly relevant, and even if CRC believed it was cumulative, to "resolve all doubts in favor of disclosure" might have been the more proper course. Nonetheless, CRC's patent law expert, for-

mer Commissioner Schuyler, stated that in his opinion CRC did not need to cite the application because similar information was included in the two Guttman, Hermann & Rhembaum articles that were cited, and Mr. Shakely, the attorney who prosecuted the application, testified as to his reasons for deciding not to cite the application. Thus, although in the Court's view the application was more relevant than the articles because of the inclusion of example 13, there is a sufficient basis for the jury's finding that CRC's failure to disclose this reference involved no element of "wrongfulness, willfulness, or bad faith." *E. I. duPont de Nemours & Co. v. Berkley & Co.*, 620 F.2d at 1274. *See Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 186 (8th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). Medtronic has not as a matter of law met its "heavy burden [of] establishing inequitable conduct," *E. I. duPont de Nemours & Co. v. Berkley & Co.*, 620 F.2d at 1275, and the Court declines to disturb the jury's verdict in this regard.

## IV. DAMAGES

Three issues must be addressed concerning the amount of damages CRC is entitled to in compensation for infringement of the Moser and Schneider patents. First, plaintiff suggests that because the jury verdict on damages is contrary to the weight of the evidence, a new trial is warranted, absent an agreement by CRC to remit a reasonable amount of the award. Second, plaintiff has moved the Court for an Order imposing a judicial license at a reasonable royalty rate to apply prospectively to Medtronic batteries manufactured under the Moser and Schneider patents for the remaining life of the patents (seven years). Finally, defendant opposes both of plaintiff's motions, and has moved for an award of prejudgment interest.

### A. *Damage Award*

CRC sought to recover damages in this case under a reasonable royalty theory.

It was CRC's burden to prove by a preponderance of the evidence the amount of money it would have received from Medtronic had Medtronic been paying a reasonable royalty for use of the Moser and Schneider patents during the period of infringement. A reasonable royalty is determined by applying the "willing buyer-willing seller" test. This test measures what a hypothetical patentee would accept as a license fee, neither party being forced to enter into the agreement. In other words, a reasonable royalty is the amount that two free and uncoerced bargainers would have agreed upon as of the date when infringement began. *See generally* 5 D. Chisum, *Patents* § 20.03[3] (1980).

A number of factors may be considered in calculating a reasonable rate. *See Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D. N.Y.1970), *modified,* 446 F.2d 295 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). Medtronic alleges that the Court erred in admitting evidence of its pacemaker profit, but in the Court's view such profit, if apportioned to reflect the amount of anticipated profits due to the patented invention, is an appropriate consideration in determining a reasonable royalty. *See id.,* factor 7; *Zegers v. Zegers, Inc.,* 458 F.2d 726, 728–29 (7th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 131, 34 L.Ed.2d 132 (1972). Courts give consideration to the anticipated profits of the infringer in determining a reasonable royalty on the theory that a willing licensor and a willing licensee would divide the anticipated profit between them: a licensee would not pay a royalty that would prevent it from obtaining a reasonable profit. Although the "willing licensee-willing licensor" rule requires the royalty to be determined in light of anticipated profits when the infringement began, evidence of subsequent actual profits is relevant to forming a judgment as to anticipated profits, and the Court thus did not err in ruling that CRC could introduce evidence of that portion of Medtronic's pacemaker profit due to the use of batteries found to infringe the Moser and Schneider patents. *See* 5 D. Chisum, *Patents* § 20.02[3](a)(iv) (1980).

The real problem with respect to the introduction of profits in this case revolves around CRC's failure to apportion them adequately. Medtronic's reports contain official profit figures for pacemakers only. The use of pacemaker profits is improper because the *entire* value of the pacemaker is not derived from the patented features of the battery. *Compare Western Electric Co. v. Stewart-Warner Corp.,* 631 F.2d 333, 339–41 (4th Cir. 1980), *cert. denied,* 450 U.S. 971, 101 S.Ct. 1492, 67 L.Ed.2d 622 (1981); *American Safety Table Co. v. Schreiber,* 415 F.2d 373, 378 (2d Cir. 1969), *cert. denied,* 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682 (1970); *Micro-Magnetic Industries, Inc. v. Advance Automatic Sales Co.,* 372 F.Supp. 477, 484 (N.D.Cal.1972), *aff'd,* 488 F.2d 770 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1943, 40 L.Ed.2d 291 (1974). CRC's exhibits 191A–E contained no apportionment: rather these exhibits expressed the royalty rate requested by CRC—20% of Energy Technology sales or $44 to $50 per battery—as a percentage of Medtronic's profit and sales per *pacemaker.* The only apportionment by CRC was made by Mr. Wallett, who gave his opinion that 30% of Medtronic's pacemaker profit was due to the battery, based upon the ratio of the standard cost of the battery compared to the standard cost of the pacemaker.[7] CRC's counsel also used the pacemaker profit figures in his closing argument to the jury.

The Court concludes, based upon the amount awarded by the jury, that the admission of the exhibits without any apportionment and the emphasis on the large

7. Mr. Rick of Medtronic testified that the percentage of pacemaker cost due to the battery decreased from 25% in 1978 to 10% in 1982, and the percentage of the battery cost to the sale price of the pacemaker decreased from 5% in 1978 to 2% in 1982 as a result of increases in the cost of the pacemaker and in the pacemaker sale price.

pacemaker profits of Medtronic[8] was overly prejudicial and requires a new trial. The purpose of a damage award for patent infringement is to give the patentee reasonable and full compensation for the loss incurred because of the patent infringement. *Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 664 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Of course the reasonable royalty "fiction" should not be applied in a vacuum so as to encourage infringement that requires the patent owner to undertake expensive litigation only to collect the normal royalty rate, *see, e.g., Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158–59 (6th Cir. 1978), but in this case the jury's verdict went beyond compensation to grant what amounts to an excessive, punitive recovery.

A review of the evidence presented at trial demonstrates that the award is unsupported in any substantial way. CRC's evidence in support of its reasonable royalty request consisted solely of Mr. Tepper's opinion that $44 to $50 per battery was a reasonable amount. Certainly a patent owner may express an opinion as to what rate would be appropriate, but the $44 to $50 per battery figure does not in any way conform to reality. CRC cannot actually have believed that anything even close to that figure would legitimately have been obtained from Medtronic had a license agreement been signed in 1976 or 1977. No reasonable person could award a figure that represented 20% of Energy Technology sales in this case. A more reasonable figure could perhaps be derived from the per battery "transfer price" used by Medtronic internally,[9] but this price is to a certain extent an arbitrary one, because Medtronic makes no sales to third parties. CRC did establish that the price represented the total cost of manufacture plus a certain percentage increase for "profit" to the Energy Technology Division, but the Court believes that these figures do not necessarily reflect the value of the batteries to Medtronic for purposes of setting a reasonable royalty rate.

The most persuasive evidence of what a willing buyer and willing seller would agree to consists of the two existing agreements between CRC and WGL and Cardiac Pacemakers, Inc. (CPI), and the terms that CRC had actually proposed to Medtronic. *See Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 612 F.2d 1353, 1358 (3rd Cir.), *cert. denied,* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980). The two existing licenses do not constitute an established royalty, *see generally Faulkner v. Gibbs,* 199 F.2d 635 (9th Cir. 1952); *Rude v. Westcott,* 130 U.S. 152, 9 S.Ct. 463, 32 L.Ed. 888 (1889), but these agreements are highly persuasive evidence, absent some indication that the rate is artificially low. *Trio Process Corp. v. L. Goldstein's Sons,* 612 F.2d at 1358, 1361. The license agreement between CRC and WGL requires WGL to pay 5% of the battery selling price, which results in a $5 to $8 per battery rate. Although this agreement may be artificially low because of Greatbatch's key role in developing and adapting the lithium-iodine battery for use in pacemakers, this is all CRC would have received had Medtronic continued to purchase its battery requirements from WGL. The agreement with CPI was reached in 1978—two years after CRC's initial license proposal to Medtronic and one year after Medtronic's infringing activity began. This agreement provides for a top royalty of $11.50 per battery, with volume discounts to as low as $8 per battery on production in excess of 20,000 units.[10] The CRC–CPI

---

**8.** Counsel's references to Mr. Tepper's pain and suffering also may have prejudiced the jury, despite the Court's cautionary instruction following counsel's closing argument. Such remarks were wholly inappropriate and could only have been calculated to arouse the jurors' sympathies in the hope of obtaining a higher verdict than was justified.

**9.** This transfer price ranged from $130 to $150 per battery.

**10.** Medtronic's battery production has exceeded 50,000 units every year since manufacturing began. Had Medtronic been paying royalties under the CPI license, it would have paid CRC $3,147,660, plus any adjustment for the consumer price index fluctuations.

agreement also contained an adjustment clause, tied to the consumer price index. The only evidence that this agreement was artificially low was presented by Mr. Tepper, who stated that CPI "took a chance" on the technology when lithium-iodine battery use was not widespread. Ninety percent of Medtronic's pacemakers in fiscal year 1978 incorporated the lithium-iodine battery, however, and thus the Court finds no reason to believe that the CPI license rate is anything other than a reasonable one with respect to what Medtronic and CRC would have negotiated in 1977. In fact, CRC offered Medtronic a flat $8 per battery rate in 1976, and CRC's counsel suggested in argument to the jury that the CPI license agreement terms were also offered to Medtronic.[11]

The jury's verdict represents an average royalty of $14.05 per battery, ignoring the lesser amount due for the 16,586 batteries sold to the government.[12] Because this figure is unsupported by any of the prior existing or proposed licenses, it is contrary to the great weight of the evidence and substantial injustice would result should the Court allow this award to stand. The Court will therefore order a new trial on damages if CRC does not elect to remit the amount of damages in excess of what the Court believes is the maximum amount reasonably supported by the evidence, $3,516,300. This amount equals approximately $9.75 per battery,[13] which is greater than what Medtronic would have paid had it accepted the flat $8 per battery license or the CPI license, and thus fully compensates CRC for all of the damage it has suffered as a result of Medtronic's infringement while not "rewarding" infringing behavior. This amount also represents a more just result than the jury's verdict, in that it does not unfairly penalize Medtronic for its good faith challenge to the validity of CRC's patents.

### B. Judicial License

Medtronic would have the Court apply this figure prospectively as well in the form of a judicial license for the remaining seven years of the Moser and Schneider patents. In the usual case, the patent owner is entitled to enjoin any further infringement, a remedy which CRC bargained away by entering into the June 25, 1976 Agreement. Nonetheless, the Court declines to impose any future license arrangements at this time: if the parties themselves fail to negotiate a license agreement, CRC may bring another action to collect those damages that it may be able to establish under a preponderance of the evidence standard. The circumstances of this case are not as extreme as those in cases cited by Medtronic, which in the interests of fairness required that a judicial license be imposed. See, e.g., Foster v. American Machine & Foundry Co., 492 F.2d 1317 (2d Cir. 1974); Royal McBee Corp. v. Smith-Corona Merchant, Inc., 295 F.2d 1 (2d Cir. 1961); Allied Research Products v. Heatbath Corp., 161 U.S.P.Q. 527 (N.E.Ill.1969). The Court does not believe that the exercise of its discretion in the manner requested by Medtronic is warranted here and Medtronic's motion in this regard will be denied.

### C. Prejudgment Interest

Finally, the Court must evaluate whether its discretion should be exercised to

---

11. CRC offered Medtronic the flat $8 per battery rate in June 1976, along with the proposed technology transfer agreement, which later became the June 25, 1976 Agreement. Further negotiations between the parties resulted in another offer in 1977 by CRC that raised the per battery rate to $10 based upon Medtronic's suggestion that the patents be licensed separately. CRC indicated that if each of the patents were to stand independently, then "the royalty rates will have to go up." Both the WGL and CPI license agreements license the Moser and the Schneider patents together.

12. This per battery figure includes both the batteries sold to the government and those manufactured using the 50:1 ratio for which Medtronic is not liable to CRC under the Schneider patent. It is not clear how many, if any, of the 50:1 ratio batteries were sold to the government. The number of batteries that are royalty-free under the Schneider patent thus ranges from approximately 16,586 to 32,117.

13. See note 12, supra.

award prejudgment interest to CRC. *See Creative Cookware, Inc. v. Northland Aluminum Products, Inc.,* 678 F.2d 746, 751 (8th Cir. 1982) (citing *Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d at 665–68). Courts have taken differing positions on the issue of when and whether prejudgment interest should be awarded. *Compare Columbia Broadcasting System, Inc. v. Zenith Radio Corp.,* 537 F.2d 896, 897 (7th Cir. 1976) (only in exceptional cases) *with Devex Corp. v. General Motors Corp.,* 212 U.S.P.Q. 643, 657–58 (3rd Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982) (in compensation for delay). *See generally* 5 D. Chisum, *Patents* § 20.03[4] at 20–168 to –173 (1980). Although CRC argues that because the modern trend is increasingly toward an award of prejudgment interest, *see, e.g., Saf-Gard Products, Inc. v. Service Parts, Inc.,* 491 F.Supp. 996, 1010 (D.Ariz. 1980), such an award is warranted in this case, the Court must disagree. The damage award suggested by the Court *supra* fully compensates CRC for Medtronic's infringement. There has been no bad faith on the part of Medtronic, which in this Court's view is the better rule for awarding prejudgment interest, and in any event CRC has presented no persuasive reason for departing from the general rule that interest not be awarded on nonliquidated sums. *See, e.g., Taylor v. RayGo, Inc.,* 680 F.2d 1223 (8th Cir., 1982). CRC's motion for an award of prejudgment interest will therefore be denied.

## V. CONCLUSION

This was a long and difficult case, but the Court believes that the jury was attentive to the evidence presented and reached correct decisions on most of the special verdict questions submitted. The Court holds that the Moser and Schneider patents are valid, although the issue of the obviousness of the Moser patent is a close one, and also finds the patents enforceable and infringed by most of Medtronic's batteries. Because the plaintiff's 50:1 ratio batteries do not infringe the Schneider patent, the Court will grant Medtronic's motion for judgment notwithstanding the verdict on the issue of infringement of the Schneider patent by these batteries. The Court is convinced that a new trial with respect to the other validity, enforceability, and infringement issues would not produce a substantially different result, and will deny plaintiff's motion with respect to them.

A different conclusion is warranted for the damages aspect of the case, because the jury's verdict of $5,066,900, if upheld, would in the Court's opinion result in a miscarriage of justice. This verdict is excessive in view of the prior and existing license agreements, and the Court will grant plaintiff's motion for a new trial on this issue unless the defendant agrees to remit that portion of the damage award in excess of $3,516,300 within ten days of the date of this Order. Plaintiff's request for the imposition of a judicial license will be denied, as will defendant's motion for prejudgment interest. Upon review of all the circumstances in this case, the Court finds it unnecessary to exercise its discretion to grant either of these motions. Finding that substantial justice will thus be done in this case,

IT IS ORDERED THAT:

1. Plaintiff's motion for judgment notwithstanding the verdict on the issue of infringement of the Schneider patent by plaintiff's 50:1 ratio batteries is granted. Plaintiff's motion for judgment notwithstanding the verdict is in all other respects denied.

2. Plaintiff's motion for a new trial on the damages issue is granted unless defendant agrees to remit that portion of the damage award in excess of $3,516,300 within 10 days of the date of this Order. Plaintiff's motion for a new trial is in all other respects denied.

3. Plaintiff's motion for the imposition of a judicial license for the remaining term of the Moser and Schneider patents is denied.

4. Defendant's motion for prejudgment interest is denied.